IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CERTIFIED ENGINEERING COPIER SYSTEMS, INC.,<br><br>    Plaintiff,<br><br><br><br>    vs.<br><br><br>NATIONAL CITY COMMERCIAL CAPITAL COMPANY LLC,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S DAUBERT MOTION IN LIMINE AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S DAUBERT MOTION IN LIMINE<br><br><br><br><br><br>Case No. 2:07-CV-293 TS |

This matter is before the Court on Plaintiff Certified Engineering Copier System's ("CES") Motion in Limine to Exclude Portions of Ronald Bennett's and Daniel LaGuardia's Expert Report and Testimony and Defendant National City Commercial Capital Company's ("National") Motion for *Daubert*[1] Hearing.  A *Daubert* hearing was held on March 31, 2009, at which time oral arguments from the parties were heard regarding the cross-motions in limine.

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The case arises out of a contractual dispute, wherein National promised to deliver a certain number of wide-format copiers of a certain make and model type (the "Copiers") in a specified condition. Specifically, the Copiers were to have "minimal usage," be in "good working order," and be without "significant cosmetic defects." CES brought suit when, according to the Complaint, National failed to deliver all of the copiers, and those it did deliver were in a much poorer state than promised. National filed a counterclaim, alleging that CES failed to pay the contract price for the delivered copiers.

National proposes to call as expert witnesses, among others, Ronald Bennett and Daniel LaGuardia. Bennett is a service technician for a company that purchases and sells wide-format copiers, including copiers of the same make and model as the Copiers. LaGuardia is vice president of sales for the same company. Relevant to CES's Motion in Limine, National intends to elicit from Bennett expert testimony regarding the general state of the copiers, as delivered to CES, as well as potential alternative explanations for alleged damages to the copiers. National intends to elicit from LaGuardia expert testimony as to the marketability of the copiers.

CES proposes to call as expert witnesses, among others, Timothy Dowdeswell and Ted Collins. Dowdeswell is president of a company that sells and services copiers, including wide-format copiers, generally, and specifically copiers of the same make and model as the Copiers. Collins is the owner of a company that buys and sells used copiers throughout the country. Relevant to National's Motion for *Daubert* Hearing, CES intends to elicit from both Dowdeswell and Collins expert testimony regarding the meaning, in the industry, of "minimal usage" and "significant cosmetic defects." CES also intends to elicit from Dowdeswell expert testimony as to the meaning of "good working order" and whether the Copiers were in good working order as received by CES,

as well as the cost of bringing the Copiers in compliance with a standard of good working order. CES intends to elicit from Collins expert testimony as to the general marketability of the copiers.

For the reasons set forth below, the Court will deny National's motion in limine, and will grant in part and deny in part CES's motion in limine.

## I.  STANDARD OF REVIEW

The United States Supreme Court has stated that Fed. R. Evid. 702 requires district courts to act as gatekeepers in order to assure that all expert testimony is both reliable and relevant,[2] and has extended that gatekeeping role beyond scientific evidence to all expert testimony.[3]  Expert testimony is to be admitted when the Court has determined that "the expert's proposed testimony is [specialized] knowledge, and . . . the evidence 'fits' the current issue and will assist the jury."[4] The Court must make a determination of reliability by inquiring "whether the reasoning or methodology underlying the testimony is scientifically valid."[5]  The Court must also make a determination of relevance by inquiring "whether proposed testimony is sufficiently relevant to the task at hand."[6]

National argues that Bennett and LaGuardia intend to offer testimony that invades the province of the jury by offering legal conclusions which are the subject of this lawsuit.  Even if National is correct regarding the import of the testimony to be offered by Bennett and LaGuardia,

---

[2]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

[3]*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999); *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004).

[4]*Daubert*, 509 U.S. at 592.

[5]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005).

[6]*Id.*

the Tenth Circuit has stated that such testimony is permissible so long as the expert explains the basis of their opinions in sufficient detail to permit the jury to independently evaluate their conclusions.[7]  Additionally, nothing in Fed. R. Evid. 703 prohibits an expert from relying on data gathered by others and the observations of other parties.[8]

## II.  BACKGROUND

CES and National entered into a contract, wherein National was to provide CES with 300 used Xerox machines for a fixed per-unit price.  Leading up to the execution of the contract, various representations were made by National to CES regarding the state of the Xerox machines.  Between March and May, 2006, 292 of 300 Xerox machines were delivered to CES.  The total contract price for the Xerox machines was approximately $1,575,000.  CES, however, paid only $1,143,750 to National.  CES now claims that the machines were delivered to the wrong place and that the quality of the machines was far below what was represented by National.  National disagrees, and alleges that CES received the machines it contracted for, but refuses to pay the agreed-upon price.

In connection with this litigation, National sent Bennett and another service technician to the location where CES had stored the copiers it had received from National.  Bennett and his associate inspected approximately twenty copiers, including at least one copier from each room in the warehouse where copiers were stored.  Bennett and his associate inspected both easily accessible copiers and those that required them to move other copiers in order to gain access.  Bennett and his associate would attempt to boot up the system and print out a configuration sheet, which listed the

---

[7] *Karns v. Emerson Elec. Co.*, 817 F.2d 1452, 1459 (10th Cir. 1987).

[8] *See Westfield Ins. Co. v. Harris*, 134 F.3d 608, 612 (4th Cir. 1998) ("the [Federal Rules of Evidence] expressly authorize that . . . such expert opinions may be based, not only on data and direct observations, but also on the opinions and observations of others . . . .").

equipment's serial number, feature keys installed, and the print volume.  They also visually inspected the inside and outside of the copiers.  As part of the inspection, Bennett noted that the warehouse was dirty and crowded, that there were items stacked on top of some of the copiers, and that there appeared to be footprints on top of approximately fifteen of the copiers.  He also noted that there were parts missing from some of the copiers.  From his inspection and the inspection of his associate, Bennett intends to testify that, in his opinion, the Copiers were in normal and operable condition, and that the volume on the units inspected seemed average for equipment coming off a three year lease.  Bennett also intends to testify regarding what he believes to be the likely causes of the problems reported by CES.

National also asked LaGuardia to opine as to what it would have taken for CES to have had the copiers ready for resale.  Using the report and notes generated by Bennett, LaGuardia opined that CES would likely have to engage in some effort to resell the copiers.  LaGuardia indicates that his employer purchases used copiers in deals similar to the one at issue here, and that it is to be expected that time and money will have to be expended in order to get used copiers ready for resale.  LaGuardia also intends to testify that CES's plans to sell the Copiers was unrealistic, and that CES's business plan for selling the Copiers was insufficient to the task.

CES asked Dowdeswell and Collins to review inspection reports created by CES's technicians as each of the Copiers were received (the "Inspection Reports").  In the Inspection Reports, CES technicians inspected each of the Copiers, took multiple pictures, printed out configuration sheets, and indicated any problems.  After reviewing the Inspection Reports, Dowdeswell was asked to opine as to what would constitute "minimal usage" and "working order" and whether the Copiers met those definitions.  Dowdeswell was also asked to opine as to what would constitute "significant cosmetic defects" and the cost of necessary repairs to the copiers.  CES

5

asked Collins to opine as to what would constitute "minimal usage" and "significant cosmetic defects," and to opine as to whether he would be willing to pay for copiers as described by National. CES also asked Collins to opine as to whether the Copiers could qualify for a full service maintenance agreement, and as to the value of the copiers in 2006, when received by CES, and in 2008, when this case was filed.

III.  DISCUSSION

As a preliminary matter, the Court notes that, as required by *Daubert*, it will limit its inquiry solely to the questions of whether the proposed testimony is relevant and whether it is reliable. Especially in a case such as this, where competing experts intend to address the fundamental questions of the case, and where they arrive at different conclusions, *Daubert* does not require the Court to determine which the jury is more likely to believe.  At the March 31, 2009 hearing, counsel for National raised certain questions which could be considered by the jury in determining what weight to give the evidence presented by the expert.  Such concerns are commonly raised in relation to *Daubert* motions, but they are beyond the narrow questions faced by the Court in a *Daubert* proceeding.  So long as the expert has the requisite expertise and the testimony offered is both reliable and relevant, the Court must deny the motion in limine under *Daubert* and admit the testimony, leaving to the jury the task of weighing the evidence.

A.    ROBERT BENNETT

Bennett and his associate personally inspected twenty copiers while in the warehouse where the Copiers had been placed by CES upon receiving them from National.  Bennett has personal knowledge regarding the twenty copiers he and his associate inspected, as well as the conditions of

the warehouse.[9]  Bennett is therefore qualified as a fact witness for the conditions of the copiers he

and his associate examined, as well as the conditions of the warehouse.  Only the application of his

relevant expertise to the facts of which he has personal knowledge, as to whether the condition of

the copiers met some external standard, is truly at issue in the present *Daubert* dispute.

The expert report generated by Bennett and LaGuardia lists Bennett as being a 15-year

employee of his company, which sells used copiers of the same type as at issue here.  Bennett is

listed as the Lead Service Technician for his employer, with an Associates Degree in Electronics and

various training, including specific training from the manufacturer on the specific model of the

Copiers.  Bennett is also listed as having experience installing and maintaining various copiers,

including ones of the same model as the Copiers.  The Court therefore finds that Bennett has

sufficient specialized knowledge, training, and experience related to the Copiers to offer expert

testimony on the technical aspects of the Copiers.

Bennett intends to offer testimony regarding applicable standards for the terms "minimal

usage" and "good working order," and whether the Copiers meet that standard.  Bennett also intends

to offer testimony regarding possible causes of the damages to the Copiers, specifically that some

of the damage could have been caused after the Copiers were received by CES.  Bennett's proposed

testimony goes directly to the primary question at issue in this case–whether National provided CES

with the Copiers in the promised condition, and is therefore directly relevant to the case.  The Court

finds that Bennett's training and extensive work experience in the industry are sufficient to render

his testimony regarding what constitutes "minimal usage" and "good working order" in the industry

---

[9]Bennett is entitled to rely on the observations of his associate, as those observations were
communicated to Bennett.  Fed. R. Evid. 703 ("The facts or data in the particular case upon
which an expert bases an opinion or inference may be those . . . *made known* to the expert at or
before the hearing.") (emphasis added).

both reliable and relevant, but also finds that Bennett's proposed application of those standards is reliable only with regard to the approximately twenty copiers which he and his associate personally inspected.  The Court also finds that Bennett's extensive work experience repairing copiers makes his testimony regarding possible sources of the damages to the Copiers relevant and reliable, but only with regard to those copiers he and his associate personally inspected.

Plaintiff argues that Bennett did, at best, a cursory inspection of the copiers, and that his application of standards to the copiers he inspected are therefore unreliable.  The Court finds, however, that the inspection conducted by Bennett and his associate is sufficient to allow Bennett to testify regarding the application of industry standards to the twenty copiers they inspected.

Bennett and his associate visually inspected twenty copiers, and were able to obtain configuration reports for some of the copiers, which would indicate how much use they had received prior to being sold to CES.  From the volume of each copier, Bennett calculated an average volume. He then compared that average volume with the acceptable volume range given by the manufacturer, and concluded that the average volume was minimal.  He also concluded that, in general, the copiers he inspected were in good working order, although some work would need to be done before the copiers could be sold by CES.

The parties dispute certain problems which are common to these types of copiers, and whether the existence of these problems would disqualify a copier from being in "good working order."  National essentially claims that the problems may be dealt with on an as-needed basis, and do not require a permanent fix in order for the copier to be in good working order.  CES argues that the copier manufacturer has a permanent fix, and that the permanent fix must be in place for the copiers to be in good working order.  As noted, disputes such as these impact the relative weight

which the jury will give the evidence, but they are not relevant to a determination of whether the proposed expert testimony is reliable or relevant.

Finally, Bennett opined as to whether certain problems identified by CES are an impediment to resale of the copiers and, if so, what type of repairs would be needed prior to resale.

CES raises a number of questions regarding Bennett's methodology, specifically that: (1) if a copier failed to start, Bennett simply unplugged it and moved on; (2) when Bennett's inspection indicated other problems, Bennett did not seek to identify the source of the problem; and (3) Bennett admitted that he did not know the condition of the copiers when they were received by CES. Each of these concerns appear to be legitimate issues to raise on cross examination, but do not address the reliability of Bennett's methodology, at least when considering that Bennett's testimony addresses only whether the twenty copiers he and his associate inspected were, as a general rule, in good working order and had minimal usage. The Court finds that Bennett's proposed expert testimony regarding the twenty copiers of which he has personal knowledge is both relevant and reliable, and his expert testimony will be allowed.

However, CES correctly points out that Bennett did not inspect a scientifically random sample of the Copiers, which makes any extrapolation of the condition of the Copiers, as a whole, from the condition of a small sample, unreliable.[10] Using the conditions of a small sample to draw conclusions about a much larger group is statistically reliable only if the small sample is chosen at random. Bennett's inspections indicates an attempt at randomness, but Defendant has provided no evidence that Bennett's sample was statistically random, making general conclusions about the Copiers inherently unreliable under accepted statistical standards. The Court will therefore exclude

---

[10] *United States v. Rivera-Maldonado*, 194 F.3d 224, 229 n.8 (1st Cir. 1999); *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 635 (1st Cir. 1996).

that portion of Bennett's testimony which extrapolates the condition of the Copiers, as a whole, from the condition of the twenty copiers of which Bennett has personal knowledge.

Bennett may also wish to testify as to whether the copiers were in "expected"[11] condition. This testimony apparently arises from the fact that Bennett's company purchased the same model of copier from National at the same time that CES did.  However, Bennett has shown no basis for testimony as to the subjective belief of either CES or National.  Bennett's testimony about the general condition of the copiers may allow the factfinder to draw inferences regarding what CES and National likely were expecting, but there is no foundation for Bennett to testify regarding another's expectation.

B.     DANIEL LAGUARDIA

National's expert report indicates that LaGuardia has been with his employer for seven years, and that he is part owner and Vice President of Sales.  He has some in-house training on the copiers that they sell, but most of his experience is in sales.  LaGuardia did not inspect any copiers, and appears to have relied exclusively on the report created by Bennett.  LaGuardia is entitled to rely on information provided to him by Bennett, but only with regard to the twenty copiers Bennett and his associate personally inspected.

LaGuardia's work experience is sufficient for him to offer an opinion regarding the meaning of the terms "minimum usage" and "good working order" as used by companies similar to his employer.  Such opinions are relevant to the central issue in this case, and his work experience makes his opinion on these issues reliable.  However, LaGuardia also intends to offer opinions regarding the steps CES would have needed to take in order to resell the Copiers and whether doing

---

[11]Docket No. 80 at 4.

so would have been profitable.  LaGuardia also intends to testify that, in his opinion, the reason CES was unable to make a profit off the copiers is that they did not have a viable business plan in place prior to taking delivery of the copiers.  The Court finds, however, that LaGuardia's testimony on these additional subjects is unreliable and will be excluded.

LaGuardia's company buys and sells the model of copier in question here, but does so within a relatively limited geographical region.  At the March 31, 2009, hearing, National argued that the market for the particular model of copiers is so narrow that LaGuardia knows the national market and should be allowed to opine regarding that national market.  National's arguments are directly contradicted, however, by LaGuardia's own deposition testimony, in which he stated that CES was unlikely to be successful in their business plan because it would have required selling the Copiers outside CES's limited geographical area, and that doing so is difficult.  LaGuardia will therefore be prohibited from offering testimony regarding the steps CES should have taken to get the Copiers ready for sale, how much those steps would have cost CES, and whether it would have been profitable.

The limited geographical scope of LaGuardia's current employer also makes LaGuardia's proposed testimony regarding CES's lack of a "viable" business plan completely unreliable, since business conditions can vary dramatically from one region to another.  The Court will therefore exclude LaGuardia's testimony regarding CES's business plan.

C.    TIMOTHY DOWDESWELL

Dowdeswell is the president and owner of a company which sells similar copiers to engineering firms, architects, construction companies, and municipalities.  His company is based on Colorado, but apparently has sold copiers throughout the U.S. since 1988.  Dowdeswell is the founder of the company, and therefore has over 20 years experience in the industry.  National argues

11

that he is a salesperson, not a technician, and that he cannot, therefore, offer expert testimony on technical matters.  This argument, however, ignores the entirety of Dowdeswell's experience.

Dowdeswell admits that his primary responsibilities are in sales, not in servicing copiers.[12] However, he began his career as a service technician, switching to sales and management sometime after founding his own company.  Further, while National argues that it has been many years since Dowdeswell received any manufacturer training on copier service, Dowdeswell accompanies service technicians on a regular basis, and is present as repairs are made.  Moreover, testimony at the March 31, 2009 hearing indicated that Dowdeswell has, on occasion, overruled the service recommendations of service technicians, and that such decisions by Dowdeswell are the result of constant interaction between Dowdeswell and customers and between Dowdeswell and his service technicians.  CES argues that Dowdeswell relays customer expectations to service technicians and uses feedback from service technicians in consulting with customers on the likely service needs of their copiers.  The Court finds that Dowdeswell has sufficient work experience and training to qualify him as an expert for the purposes of National's *Daubert* motion.

Dowdeswell intends to testify regarding the meaning of the terms "working order," "minimal usage," and "significant cosmetic damage," as well as the cost of necessary repairs.  All of these topics are relevant to the central contractual questions raised by the case.  Moreover, Dowdeswell's experience and training are sufficient to make his testimony as to what is generally meant by "working order," "minimal usage," and "significant cosmetic damages" reliable.  Moreover, in preparing to offer this testimony, Dowdeswell examined the Inspection Reports, which included configuration reports and photographs of each of the Copiers.  Dowdeswell thus gained knowledge

---

[12]Docket No. 92 at 18.

regarding *each* of the Copiers from reviewing the Inspection Reports, allowing Dowdeswell to apply the standards for "working order," "minimal usage," and "significant cosmetic damage" to each of the Copiers.  Moreover, by reviewing the Inspection Reports, Dowdeswell was able to determine what repairs he believed each copier would require before they would meet the standards described in the contract.  Finally, Dowdeswell's extensive work experience in selling used copiers allowed him to estimate the cost of necessary repairs.  The Court finds that Dowdeswell's testimony is both reliable and relevant, and National's *Daubert* motion will be denied as to Dowdeswell.

D.    TED COLLINS

Collins is the owner of a company that buys and sells used copiers.  His company buys approximately seventy to eighty copiers annually, including the model of copier at issue here.  The copiers are then sold, wholesale, to various buyers.  In preparing his testimony, Collins examined the Inspection Reports, gaining knowledge about the condition of each of the Copiers.

Collins intends to testify regarding the meaning of the terms "minimal usage" and "significant cosmetic damage," as well as what it would have taken for CES to place the Copiers under a Full Service Maintenance Agreement ("FSMA") and the relative value of the Copiers in 2006 and 2008.  Collins' testimony goes directly to the basic contractual questions at issue in the case, and is therefore relevant, leaving only a determination of whether his testimony is reliable.  National argues, and CES concedes, that Collins "does not generally see the copiers he purchases or sells."[13]  However, Collins' proposed testimony regarding "minimal usage" and "significant cosmetic damage" is intended only to describe, generally, what customers would expect when hearing those terms.  Because he does not intend to opine regarding the application of those terms

---

[13]Docket No. 89.

Case 2:07-cv-00293-TS   Document 96   Filed 05/11/09   Page 14 of 15


to the Copiers, his lack of experience in inspecting copiers prior to sale does not adversely impact the reliability of his testimony.

With regard to Collins' third proposed topic, whether the Copiers could be placed with buyers under a FSMA, National did not dispute CES's assertion that Collins had experience buying used copiers and re-selling them under an FSMA.  His experience in selling used copiers under an FSMA and his study of the Inspection Reports, therefore, make his testimony regarding whether the Copiers could be sold under an FSMA sufficiently reliable to defeat National's *Daubert* motion.

Finally, Collins is also qualified to offer expert testimony in this case as to the general value of used copiers of the type at issue here and the depreciation of the copiers since 2006.  He has sufficient experience buying and selling these copiers that his testimony regarding the value of these copiers in 2006, when CES purchased them from National, and their depreciated value in 2008, that his testimony regarding the Copiers' value would be helpful to the trier of fact.

## IV.  CONCLUSION

It is therefore

ORDERED that Plaintiff CES's Motion in Limine to Exclude Portions of Ronald Bennett's and Daniel LaGuardia's Expert Report and Testimony (Docket No. 74) is GRANTED IN PART AND DENIED IN PART.  The Court will exclude all testimony from Bennett regarding the application of any contractual standards to any copiers which Bennett and his associate did not personally inspect, as well as any testimony regarding whether the Copiers were in "expected" condition.  The Court will also exclude all testimony from LaGuardia regarding CES's business plan for reselling the Copiers, the steps necessary to have the Copiers ready for resale, and whether resale by CES would have been profitable.  It is further

ORDERED that Defendant National's *Daubert* Motion to Exclude the Expert Report and Testimony of Timothy Dowdeswell and Ted Collins Pursuant to Rule of Evidence 702 (Docket No. 83) is DENIED.

DATED   May 11, 2009.

BY THE COURT:

_____
TED STEWART
United States District Judge